IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SYLVIA L. DANIELS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04 C 6360 |
| | ) | |
| | ) | Judge Mark Filip |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This case involves review of a determination by the Social Security Administration that Plaintiff, Sylvia L. Daniels, then a twenty-four year old female, does not suffer from a disability, as defined further below, such that she is unable to engage in any substantial gainful activity for at least the next year. Ms. Daniels (also "Daniels" or "Plaintiff") filed a motion for review of the administrative decision and seeks judgment in her favor as a matter of law, or, alternatively, remand of the final decision of Defendant Jo Anne Barnhart, Commissioner of Social Security ("Commissioner" or "Defendant"). (D.E. 14.)[1] The Commissioner seeks affirmance of the decision.

Ms. Daniels argues that the Administrative Law Judge's decision to deny her disability benefits should be reversed because it is plagued by legal and procedural error and is not supported by substantial evidence. The Court respectfully disagrees, and grants the Commissioner's motion, affirming the ALJ's decision. The Court denies Daniels's motion.

---

[1] The various docket entries in this case are cited as "D.E.___." The Administrative Record (D.E. 7) is also cited as "A.R. ___."

# I.  BACKGROUND AND RELEVANT FACTS

### A.  Background

By way of background, the Court notes that this case essentially involves review of a decision of Administrative Law Judge Denise McDuffie Martin. The decision of the ALJ is thorough and reflects careful attention and sifting of the evidence presented. Although the ALJ accepted some (but certainly not all) of Plaintiff's positions, the ALJ's conclusion was that Ms. Daniels was not disabled within the meaning of the Social Security rules and standards. As explained further below, although the Plaintiff has sympathetic aspects to her case, the ALJ's conclusion was a reasonable one that warrants affirmance under applicable law, which, as explained further below, calls for deference on material aspects of the ALJ's assessment. Accordingly, the Court declines the invitation to disturb the result from the ALJ proceedings.

### B.  Relevant Facts[2]

At the time of the ALJ's decision, Plaintiff, Sylvia L. Daniels, was twenty-four years old. (A.R. at 59.) In January 2003, Ms. Daniels filed for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) with the Social Security Administration. (*Id.* at 59-61, 271-73.) In her filing, Daniels alleged that she became disabled in January 2003. (*Id.* at 59.) In her disability application, Daniels alleged disability due to pain and swelling in her left leg and due to being a slow learner. (*Id.* at 12, 75).

In February 2000, Daniels's left leg began hurting her. (*Id.* at 169.) An MRI was taken on her left knee in June 2000, and it did not appear to suggest any "internal derangement." (*Id.*)

---

[2] The relevant facts are taken from the certified copy of the administrative record and as cited by both parties in their respective briefs.

Daniels nonetheless continued to report discomfort and achiness. (*Id.*) In February 2001, Daniels had arthroscopic surgery on her left knee. (*Id.* at 171.) There was no evidence of any cartilage debris and the report of the surgeon reflected nothing remarkable. (*Id.*)

In the intervening years between the first documented report of Daniels's knee pain and when she filed her DIB and SSI applications, Daniels held approximately eleven different jobs (*id.* at 71-72), some for a relatively substantial period of time (close to one year) (*id.* at 317). She also received continuing medical treatment on the knee, as discussed further below.

Daniels had a high school education through a special education program. (*Id.* at 81, 299.) After high school, she worked several jobs, including food service, home care, and janitorial positions. (*Id.* at 76, 87-94.) At the time of her application, Daniels indicated she was unable to work due to left leg pain and swelling and because she was a slow learner. (*Id.* at 75.)

Daniels lived alone in an apartment. (*Id.* at 107, 295.) She cooked four meals a day with her mother. (*Id.*) She routinely performed household chores such as cleaning, making her bed, dusting, ironing, and doing laundry, though these chores took longer as a result of the pain in her leg. (*Id.* at 97, 107, 303.) She also mowed the grass and shoveled snow. (*Id.* at 305.) Daniels left her home approximately three times a day to run errands, visit family and friends, and keep appointments. (*Id.* at 108.) She had difficulty driving because her leg would sometimes lock up on her. (*Id.* at 303.) She sometimes paid bills and went out to eat. (*Id.* at 109.) She also played video games, often watched television, and read, although she sometimes had difficulty understanding what she read. (*Id.* at 108-09.)

Daniels testified that she experienced pain in her knee when standing for more than an hour or walking farther than three blocks. (*Id.* at 297.) She stated that she had virtually constant

3

pain and swelling in her left knee, and that nothing helped to alleviate the pain. (*Id.* at 298-99.)

At the hearing, Daniels testified she was no longer seeing her treating doctors, due to a lack of

funds. (*Id.* at 312.) She visited a free clinic, although the clinic advised her to return to her

previous doctors. (*Id.* at 314.)

C. Medical Record Evidence

At the hearing, several exhibits were admitted into evidence, including medical records

and opinions prepared and ordered by Daniels's treating doctor, Dr. Moran (*id.* at 168-91), and

two doctors to whom Dr. Moran referred Ms. Daniels, Dr. Murphy (*id.* at 192-201, 210-11) and

Dr. Morales (*id.* at 202-09, 243-70). The medical evidence also included an opinion by a

consultative examiner, Dr. Choudry (*id.* at 125-27), and opinions by two doctors who had

reviewed Daniels's record, Dr. Smalley (*id.* at 128-35) and Dr. Tomassetti (*id.* at 139-52). The

medical evidence also included a report from a consultative psychological exam performed by

Dr. Hilger (*id.* at 136-38), and a report from a doctor, Dr. Papaeliou (*id.* at 124, 213-14),

requested to examine Daniels by a former employer. Additional testimonial evidence was

presented at the hearing and included the opinion of Dr. Coyle, a medical expert who had

reviewed Daniels's record (*id.* at 326-31), the opinion of a vocational expert (*id.* at 331-36), as

well as Daniels's and her father's own statements (*id.* at 290-326).

1. Dr. Moran

The record reflects that Daniels visited Dr. Mark Moran when she began to experience

knee pain in early 2000, worse in her left knee than in her right. (*Id.* at 169.) Ms. Daniels

indicated that activities such as jumping, squatting, and kneeling aggravated the pain. (*Id.*) Dr.

Moran found that there was no traumatic injury that instigated the pain. (*Id.*) An MRI revealed

4

no "internal derangement" and the examination was otherwise unremarkable. (*Id.* at 168.)

Because Ms. Daniels complained of worsening pain, Dr. Moran performed arthroscopic surgery

in February 2001. (*Id.* at 169-71.) Post surgery, he diagnosed a partially sealed tear and

synovitis of the left knee. (*Id.* at 171.) Ms. Daniels indicated initial improvements in her knee

after the surgery (*id.* at 173-74), and in February and March 2001, Dr. Moran reported she was

capable of performing sedentary work (*id.* at 182).

In April and May 2001, Ms. Daniels reported continued knee pain and stated that her

knee had given out at work on multiple occasions. (*Id.* at 179.) In June 2001, Dr. Moran

examined Ms. Daniels and reported no swelling, good range of motion, and stable ligaments;

however, Ms. Daniels continued to complain of occasional pain. (*Id.* at 178.) Nonetheless, Dr.

Moran continued to be optimistic about the patient's long-term outlook. (*Id.*)

        2.     Dr. Murphy

By 2002, Ms. Daniels was seeing an orthopedic surgeon, Dr. Michael Murphy. (*Id.* at

195.) During his exams, Dr. Murphy noted tenderness and continued pain in Ms. Daniels's

knees. (*Id.*) He initially treated the patient with medication and orthotic arch supports. (*Id.* at

195, 205-06.) When her pain continued, he recommended a lumbar sympathetic block, which

was performed by Dr. Morales. (*Id.*) In September 2002, Dr. Murphy indicated that Ms. Daniels

was capable of full-time work, but with certain limitations with respect to her capacity to push or

pull weight, her inability to operate foot controls, and his view that she should use her right leg

more than her left leg. (*Id.* at 196-201.) He also opined that Ms. Daniels could constantly sit,

occasionally stand, walk, squat and climb stairs or ladders; could occasionally lift five pounds

from floor to waist level; could frequently lift/carry up to 100 pounds from waist to shoulder

height and from shoulder height to overhead; and that she had no limitations on using her hands. (*Id.*) In November 2002, after Dr. Morales performed a lumbar sympathetic block and Ms. Daniels continued to experience pain, Dr. Murphy diagnosed Ms. Daniels as having reflex sympathetic dystrophy ("RSD").[3] (*Id.* at 195.) He referred the patient to Dr. Morales for continued pain management. (*Id.*)

### 3. Dr. Morales

Ms. Daniels first saw Dr. Mauricio Morales in August 2002. Dr. Morales diagnosed Ms. Daniels with hypertensia[4] and some area of alloydnia,[5] but no swelling, and he found that she exhibited a normal range of motion with potential limitation due to pain. (*Id.* at 202.) Dr. Morales agreed with Dr. Murphy's diagnosis of RSD, indicating that Ms. Daniels had Complex Regional Pain Syndrome ("CRPS").[6] (*Id.*) For that reason, Dr. Morales recommended a lumbar sympathetic block. (*Id.* at 208.) Dr. Morales performed the first lumbar sympathetic block in

---

[3] "RSD is a condition characterized by muscular sensitivity, pain, and restricted movement frequently disproportional to the diagnostic pathology." *Palochko v. Chater*, No. 96 C 7881, 1998 U.S. Dist. LEXIS 2380, at *1-2 (N.D. Ill. Feb. 20, 1998). "The most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma. Later, spontaneously occurring pain may be associated with abnormalities in the affected region involving the skin, subcutaneous tissue, and bone." Social Security Ruling (SSR) 03-2p, at *1. "It is characteristic of this syndrome that the degree of pain reported is out of proportion to the severity of the injury sustained by the individual." *Id.*

[4] Hypertensia is an increased sensitivity, often a sensation of pain, from what would normally be a painless touch. Dorland's Illustrated Medical Dictionary at 850 (29th ed. 2000).

[5] Alloydynia is pain resulting from non-noxious stimulus to normal skin. Dorland's Illustrated Medical Dictionary at 51.

[6] CRPS is also known as RSD or RSDS. *See* SSR 03-02p, "Titles II and XVI: Evaluating Cases Involving Reflex Sympathetic Dystrophy Syndrome/Complex Regional Pain Syndrome."

August 2002, an injection which provided the patient complete relief of symptoms and pain for three days. (*Id.*) However, the pain returned. (*Id.*) Dr. Morales recommended further sympathetic blocks. (*Id.*) Dr. Morales performed a second sympathetic block in January 2003. (*Id.* at 254-55.) After the second sympathetic block, Daniels reported she experienced twenty-four hours of pain relief, but then the pain returned. (*Id.* at 249.) Dr. Morales told Daniels that the short relief was a positive response and that treatment options included repeating the blocks, medications or even a spinal column stimulator. (*Id.* at 249.) Ms. Daniels instead requested some type of pain medication. (*Id.*) Dr. Morales prescribed the medications Neurontin and Ultram, physical therapy and TENS unit.[7] (*Id.*) Neither the medications nor physical therapy relieved Daniels's pain. (*Id.* at 242.) Ms. Daniels reported that the physical therapy was not helpful, and the therapy was discontinued. (*Id.*)

      4.    Dr. Papaeliou

In January 2003, the company then employing Daniels as a janitor requested Dr. Louis Papaeliou to examine Daniels. (*Id.* at 124.) Dr. Papaeliou reported that Daniels had related that she experienced severe and diffuse pain in her lower left leg. (*Id.*) Dr. Papaeliou noted Plaintiff's previous treatments and indicated that she did seem to have some edema as the skin on her left leg was somewhat cool compared with that of the right. (*Id.*) Dr. Papaeliou deemed Daniels incapable of resuming work and indicated that, in his opinion, Daniels should probably be considered totally disabled on a short term basis. (*Id.*)

---

[7] A TENS unit is a transcutaneous electrical nerve stimulation device used for pain relief. The Merck Manual of Diagnosis and Therapy at 2495 (17th ed. 1999).

### 5. Dr. Choudry

In March 2003, Dr. Samiullah Choudry examined Daniels for the Social Security Administration ("SSA"). (*Id.* at 125.) He reported that Daniels was "a well built female in no acute distress." (*Id.* at 127.) The exam was "unremarkable" except for exquisite tenderness in her entire lower left leg, which was out of proportion to any physical finding. (*Id.*) Ms. Daniels rated her pain as 10/10 on a 10-point scale at all times. (*Id.* at 125.) Dr. Choudry found no apparent edema, effusion, warmth, or erythema. (*Id.* at 127.) He noted the patient exhibited mild difficulty in getting on and off the examining table, in squatting and rising, and in tandem walking, and moderate difficulty in hopping on her left leg. (*Id.*) He also reported that Ms. Daniels had no difficulty with speaking, hearing, comprehension, manual dexterity, or memory. (*Id.*) He did not diagnose Plaintiff as having RSD, but rather concluded that she suffered from "left leg tenderness" and "left knee pain." (*Id.*)

### 6. Dr. Smalley

Dr. Paul Smalley, a reviewing medical consultant with Disability Determination Services ("DDS"), reviewed Daniels's records and completed a physical residual functional capacity assessment form for the SSA in March 2003. (*Id.* at 128-35.) He concluded that Ms. Daniels had the residual functional capacity ("RFC")[8] to lift/carry 10 pounds frequently and 20 pounds occasionally, to stand and/or walk about six hours out of an eight-hour day, and to sit about six hours out of an eight-hour day, but that she could not climb ladders, ropes, or scaffolds. (*Id.*) Dr. Smalley concluded that Ms. Daniels was capable of light work. (*Id.* at 135.)

---

[8] The residual functional capacity is the most an individual can still do after considering the effects of physical and/or mental limitations that affect a person's ability to perform work-related tasks. *See* 20 C.F.R. §§ 404.1565, 416.945; *see also* SSR 96-8p.

### 7.   Dr. Hilger

In May 2003, Dr. William Hilger, a licensed clinical psychologist, performed a consultative psychological evaluation of Ms. Daniels. (*Id.* at 136-138.) Prior to the evaluation, Dr. Hilger reviewed Dr. Choudry's medical report. (*Id.* at 136.) After the evaluation, Dr. Hilger concluded that Ms. Daniels had low average to borderline intellectual functioning and had a history of special education. (*Id.* at 137.) He found that she showed below average mental ability to perform work-related activities involving understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (*Id.*)

### 8.   Dr. Tomassetti

In May 2003, Dr. John Tomassetti, a state agency psychologist, reviewed the record evidence concerning Ms. Daniels. (*Id.* at 139.) He found that she had borderline intellectual functioning and, ultimately, a non-severe mental impairment. (*Id.*) He found her condition would cause mild restrictions—as opposed to moderate, marked, or extreme limitations—in daily life activities such as social functioning and maintaining concentration, persistence or pace. (*Id.* at 149.)

### 9.   Dr. Coyle's Testimony

Dr. Robert Coyle, a medical expert in psychology, also reviewed the record evidence. (*Id.* at 326.) He testified as a medical expert at the administrative hearing concerning Ms. Daniels's mental limitations. Dr. Coyle testified that Ms. Daniels's mental ability was below average and that she would have difficulty understanding detailed instructions and performing detailed, multi-step tasks. (*Id.* at 326-27.) He testified that Ms. Daniels would have only mild limitations in concentration, persistence, and pace; he concluded that her pace would be "below

average." (*Id.* at 328.) However, he did not believe Ms. Daniels's impairment met or equaled a listed impairment in the SSA regulations. (*Id.* at 326.)

### 10.   Vocational Expert's Testimony

Finally, the vocational expert ("VE"), Thomas Gresik, reviewed Ms. Daniels's record before he testified. (*Id.* at 331.) He reviewed Ms. Daniels's history, including her prior jobs as a food runner, personal assistant, maintenance worker, fast-food cook, and "loader" for the United Postal Service, and he sat through the testimony adduced at the hearing. (*Id.* at 331-33.) He testified that there were jobs available in the economy that would accommodate someone with Ms. Daniels's age, education, work experience, and limitation to sedentary work; he testified numerous jobs could be found that were simple, unskilled, routine, and with one- or two-step instructions. (*Id.* at 333.) He noted these jobs included hand packager, small parts mechanical assembler, and electronic assembler. (*Id.*) He testified these jobs numbered around 10,000 in the regional economy. (*Id.*) In response to a question posed by Plaintiff's counsel, the vocational expert testified that such jobs would require "some kind of ongoing pace that needs to be maintained" with five percent cumulative down time each work day, in addition to regularly scheduled breaks. (*Id.* at 334-35.)

### D.   The ALJ's Decision[9]

On June 4, 2004, in an eight page, single-spaced opinion, the ALJ determined that Ms. Daniels was not disabled as defined by the Social Security Act and thus was not entitled to disability benefits. (*Id.* at 11.) In reaching this decision, the ALJ conducted the five-step analysis required under 20 C.F.R. §§ 416.920, 404.1521 (2005). First, the ALJ found that

---

[9] The ALJ's written decision is located at pages 11-18 of the administrative record.

10

Daniels had not engaged in substantial gainful activity since the alleged onset of disability. (*Id.* at 12.) Second, the ALJ found that Ms. Daniels suffered from two medically determinable impairments: left knee pain/reflex sympathetic dystrophy and borderline intellectual functioning. (*Id.*) The ALJ also noted that Ms. Daniels has a history of asthma, but that this impairment is not severe and does not impose additional or significant work-related limitations. Third, although these were medically determinable impairments within the meaning of the Act and regulations, the ALJ found that these impairments did not meet or equal the severity required by the regulations. (*Id.* at 12-13.) Fourth, the ALJ found that Daniels was not able to perform her past relevant work. (*Id.* at 16.) Nonetheless, and fifth, the ALJ found that there were and are other jobs existing in significant numbers in the national economy that Ms. Daniels could perform. (*Id.* at 17.) There also are some 10,000 such jobs in the local economy. (*Id.*)

In making her findings, the ALJ found that Daniels had greater limitations and restrictions than assessed by Dr. Smalley. (*Id.* at 13.) The ALJ found that Daniels's RFC limits her to sedentary work,[10] with an additional restriction against climbing ladders, ropes, or scaffolds. (*Id.*) The ALJ further found, however, that Ms. Daniels had the ability to perform unskilled, routine, repetitive tasks that do not involve more than one or two-step instructions. (*Id.*)

To support her findings, the ALJ considered and cited to the doctors' opinions, the objective medical evidence, the vocational expert's opinion, and the testimony of Ms. Daniels

---

[10] Sedentary work is defined in the regulations as involving lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although defined as a job that involves sitting, a certain amount of walking or standing can be necessary in carrying out job duties. 20 C.F.R. §§ 404.1567, 416.967.

and her father. (*Id.* at 14-17.) She found certain evidence, such as the opinion of Dr. Papaeliou, to be less credible than other evidence, such as the opinion of Dr. Coyle, the medical expert in psychology whose conclusions she adopted and concurred with. (*Id.* at 13.) She also found that Dr. Papaeliou's suggestion that Plaintiff be considered totally disabled was not entitled to controlling weight, since it concerned a legal issue and administrative finding reserved to the Commissioner for determination, in accordance with SSR 96-5p. (*Id.* at 13, 16.) In addition, the ALJ found that Ms. Daniels's description of her symptoms and limitations was not fully credible because it was in conflict with the medical evidence and her own admitted activities. (*Id.* at 16.) Finally, in light of the vocational expert's testimony, the ALJ found that work exists in significant numbers in the national economy that Ms. Daniels is capable of performing. (*Id.* at 18.) The ALJ concluded that Ms. Daniels was not disabled and not entitled to disability benefits. (*Id.*) The Appeals Council denied Daniels's request for review (*id.* at 4-7), leading the ALJ's decision to become the decision now subject to judicial review. 20 C.F.R. §§ 404.981, 416.1481.

The Court considers both parties' motions based on the closed factual record. The Commissioner argues that the ALJ's decision should be affirmed because it is free from legal error and supported by substantial evidence. (D.E. 20. at 5-14.) Reading Ms. Daniels's papers broadly (notwithstanding that she is represented),[11] Ms. Daniels argues that the ALJ's decision should be reversed for the following reasons: 1) the ALJ committed procedural error in failing to

---

[11] The parties clash at times over rules concerning waiver of issues on appeal. Because there is no basis, at least in this Court's view, to disturb the results of the administrative proceeding, the Court has endeavored to collate all of Plaintiff's arguments and address them. This Court's ruling, however, should not be understood to preclude the SSA from arguing waiver if germane at any time in the future. Put differently, this Court did not reject the waiver arguments, but rather it did not need to address them to resolve the case at hand.

consider a previous Social Security Ruling governing cases concerning RSD; 2) the ALJ erred in her assessment of Ms. Daniels's physical condition and its impact; 3) the ALJ's decision presents an unexplained inconsistency; 4) the ALJ erred in making her credibility determinations; 5) the ALJ committed legal error in questioning certain medical diagnoses; and 6) the ALJ committed legal error in finding that Ms. Daniels can perform the jobs identified by the vocational expert. (*See* D.E. 15, D.E. 24.) As explained below, the Court denies Ms. Daniels's motion and grants the Commissioner's motion.

## II.    **LEGAL STANDARD**

Because the Appeals Council found no reason for further review, the ALJ's findings constitute the final decision of the Commissioner of the Social Security Administration. *See Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). Judicial review of the ALJ's decision is authorized by 42 U.S.C. § 405(g). An ALJ's factual findings will be upheld if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). Substantial evidence is more than a "mere scintilla," less than a preponderance, and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Thus, an ALJ's finding that is supported by substantial evidence will be affirmed even where substantial evidence also supports a contrary finding, *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992); *Kahn v. Secretary of Labor*, 64 F.3d 271, 276 (7th Cir. 1995), or where reasonable minds could disagree concerning potential factual conclusions about whether a claimant is disabled, *see Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). The ALJ's decision must also build a logical bridge between the evidence and the result. *See Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999).

An ALJ's credibility findings receive even more deference, and they will be affirmed unless they are "patently wrong." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). In contrast, if the ALJ commits legal error, reversal is mandated. *See Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

In addition, where an ALJ denies benefits, she must articulate her reasoning sufficiently to enable an informed review. *See Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995). To satisfy the minimum articulation standard, the ALJ need not discuss every piece of evidence in the record, though she must consider all relevant evidence and cannot disregard an entire line of evidence contrary to her findings. *See id.* at 308. In other words, "[a]lthough the Secretary 'need not address each piece of evidence,' . . . [the] decision must be consistent with the record as a whole." *Allen v. Sullivan*, 977 F.2d 385, 389 (7th Cir. 1992) (quoting *Stein v. Sullivan*, 892 F.2d 43, 47 (7th Cir. 1989)).

## III.   DISCUSSION

Plaintiff has offered numerous suggestions concerning why the Court should overrule the ALJ's decision—all in a somewhat scatter-shot fashion in two filings. (D.E. 15 & D.E. 24.) The Court has endeavored to consider each argument and, where appropriate, to group them together. Ultimately, for the reasons discussed below, Plaintiff's challenge to the ALJ's determination is respectfully rejected.

To determine whether a claimant is disabled, the ALJ must conduct a sequential five-step inquiry. 20 C.F.R. § 404.1520(a)-(f); *see also Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001). The ALJ must determine: 1) whether the claimant is currently unemployed; 2) whether she has a severe impairment; 3) whether her impairment equals any impairment listed in the

relevant regulations;[12] 4) whether she can perform her past relevant work; and 5) whether she is

capable of performing other work in the national economy. 20 C.F.R. § 404.1520(a)-(f);

*Zurawski*, 245 F.3d at 885. In making these five determinations, the ALJ will consider relevant

evidence such as objective medical evidence, the claimant's medical history, statements from

treating and examining physicians, statements from the claimant, and the findings and opinions

of state agency medical experts. 20 C.F.R. § 404.1512(b). If a claimant reaches Step 5, the

Secretary has the burden of proving that there are jobs in the national economy that the claimant

can perform. *See Herron v. Shalala*, 19 F.3d 329, 333 n.8 (7th Cir. 1994).

A. The ALJ's finding that Daniels is Not Disabled is Supported by Substantial Evidence Under the Guidelines for Evaluating Cases Involving RSD

1. The ALJ Did Evaluate the Case in Light of the Requirements of SSR 03-2p

The plaintiff argues that the ALJ failed to follow the guidelines set forth in SSR 03-2p,

"Titles II and XVI: Evaluating Cases Involving Reflex Sympathetic Dystrophy

Syndrome/Complex Regional Pain Syndrome." *Id.* However, although the ALJ did not cite

directly to SSR 03-2p by name, she followed the guidelines for evaluating a claim in which an

individual alleges RSD. Plaintiff relies on *Scott v. Barnhart*, 297 F.3d 589 (7th Cir. 2002), for

the proposition that an ALJ's discussion of the record evidence does not comply with the

requirement that the ALJ do so in light of legal principles applicable to the case. (D.E. 24 at 12.)

However, in that case, the ALJ failed to reference an applicable listing or even discuss the

evidence in light of the listing's analytical framework. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th

---

[12] The relevant listed impairments are set forth in 20 C.F.R. § 404, Subpt. P, App. 1 (2005).

Cir. 2002). Instead, the ALJ merely submitted that the record demonstrated that the plaintiff could not satisfy the listing. *Id.*

Conversely, in the present case, although the ALJ did not cite directly to SSR 03-2p by name, she addressed Daniels's claims in light of the procedures set forth in that regulation. SSR 03-2p, effective October 2003, contains guidelines for evaluating RSD claims. The ruling requires RSD claims to be "adjudicated using the sequential evaluation process, just as for any other impairment." SSR 03-2p. The ALJ's decision reflects a sequential evaluation under the five-step process required under 20 C.F.R. §§ 416.920, 404.1521 (2005); *see* A.R. at 12-18. In light of the regulations' requirements, SSR 03-2p specifies that the ALJ must assess the claimant's RFC and consider the claimant's symptoms, the credibility of the claimant's statements, and information provided by treating and examining physicians. The ALJ fulfills each of these requirements in her opinion (*see* A.R. at 12-18), as the discussion below will illustrate.

2.    The ALJ's Evaluation of Daniels's Physical Condition and Its Impact is Proper

In her opinion, the ALJ followed the prescribed five-step evaluative process. At step one, the ALJ found that Daniels had not engaged in substantial gainful activity since the alleged onset of disability, as the record lacked evidence to the contrary. (*Id.* at 12.) Second, the ALJ found that Ms. Daniels suffered from two medically-determinable impairments: left knee pain/reflex sympathetic dystrophy and borderline intellectual functioning. (*E.g.*, *id.*) At step three, the ALJ found that Ms. Daniels's impairments did not meet or equal any of the impairments listed in the regulations. (*Id.* at 12-13.) Significantly, SSR 03-2p notes that "an individual with RSDS/CRPS

alone cannot be found to have an impairment that meets the requirement of a listed impairment." SSR 03-2p, at *6. The ALJ also noted that Dr. Coyle, the medical expert in psychology, testified that the claimant's borderline intellectual functioning did not meet or equal a listed impairment. (A.R. at 13.) If a listing is not met, SSR 03-2p requires that an RFC assessment be made and the adjudication proceeds to the fourth and fifth steps of the evaluation process. SSR 03-2p, at *7.

        a.      The ALJ's RFC Assessment is Supported By Substantial Evidence

At step four, the ALJ determines whether a claimant's RFC allows the claimant to return to her past relevant work. A claimant's RFC is a measure of the abilities which he or she retains despite his or her impairment. 20 C.F.R. § 404.1545(a). SSR 03-2p directs the ALJ to consider the individual's symptoms and the entire case record, including third-party information, when making an RFC finding. *Id.* at *7. In making the RFC assessment in the present case, the ALJ considered a variety of record evidence, discussed further below, including "evidence submitted at the hearing level and the hearing testimony of the claimant, her father, and the medical expert." (A.R. at 13.) The ALJ found that Daniels's RFC limits her to sedentary work, with an additional restriction against climbing ladders, ropes, or scaffolds. (*Id.*) The ALJ further found that Daniels has the ability to perform unskilled, routine, repetitive tasks that do not involve more than one or two-step instructions. (*Id.*) As a result of this RFC finding and the vocational expert's testimony that Daniels's past work ranged from light to heavy in exertional demands, the ALJ found that Daniels was not able to perform her past relevant work. (*Id.* at 16.)

The plaintiff argues the ALJ failed to adequately consider Ms. Daniels's symptoms, including her pain and its treatment, in making her RFC determination, and that this failure led the decision to fall short of the ALJ's responsibility to articulate the grounds for her decision.

17

(D.E. 15 at 12 (citing *Brindsi ex rel. Brindsi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003).)

However, in her opinion, the ALJ specifically noted her duty to consider all physical and mental symptoms including pain, and the extent to which the symptoms could be accepted as consistent with the objective medical evidence and other evidence under 20 C.F.R. §§ 404.1529, 416.929 and SSR 96-7p. (A.R. at 13-15.) She also recognized the need to consider medical opinions, which reflect judgments about the nature and severity of the impairments and resulting limitations under 20 C.F.R. §§ 404.1527, 416.927 and SSR 96-2p, 96-6p. (*Id.*) Furthermore, the ALJ discussed the Plaintiff's course of treatment (*id.* at 14-16).

If an ALJ's opinion is supported by substantial evidence, it will be affirmed even where substantial evidence also supports a contrary finding. To satisfy the minimum articulation standard, the ALJ need not discuss every piece of evidence in the record, though she must consider all relevant evidence and cannot disregard an entire line of evidence contrary to her findings. *See Diaz*, 55 F.3d at 308. Thus, as the discussion below illustrates, the ALJ's RFC assessment is supported by substantial evidence which she cited from the record.

      i.     The ALJ Adequately Considered Daniel's Symptoms in making her RFC Assessment

The ALJ's discussion of the medical evidence contains several references to Daniels's own statements of her pain symptoms. With respect to Dr. Moran, the ALJ noted that Daniels "complained of pain in both knees." (A.R. at 14.) In reference to Dr. Morales's examination, the ALJ observed that Ms. Daniels "complained of diffuse pain at 10/10 intensity, which was constant and without change." (*Id.* at 15.) Moreover, in citing Dr. Choudry's examination, the ALJ remarked that Ms. Daniels "reported that any activity involving the left extremity caused

18

pain and swelling and she rated her pain as 10 on a 10-point scale—all the time." (*Id.*) The ALJ

also references Ms. Daniels's and her father's testimonies, both which further document her

allegations of leg pain. (*Id.* at 12.) Thus, the ALJ clearly documented Ms. Daniels's symptoms

in her opinion.

ii.    The ALJ Adequately Considered the Record Medical
Evidence in making her RFC Assessment

The ALJ also "considered the opinions expressed by Dr. Murphy in reaching [her]

assessment." (*Id.* at 16.) The ALJ cited to Dr. Murphy's opinion that Plaintiff could constantly

sit, occasionally stand, walk, squat and climb stairs or ladders, occasionally lift five pounds from

floor to waist level, frequently lift/carry up to 100 pounds from waist to shoulder height and from

shoulder height to overhead, and that she had no limitations on using her hands. (*Id.* at 16, 195-

97, 205-06.) She also referenced Dr. Murphy's findings concerning Ms. Daniels's limitations as

to balance control, her capacity to push or pull weight, and her inability to operate foot controls.

(*Id.*)

Additionally, and in light of Ms. Daniels's intellectual limitations, the ALJ considered the

opinion of Dr. Coyle, the medical expert in psychology whose conclusions she adopted and

concurred with, when making her RFC assessment. (*Id.* at 13.) The ALJ cited Dr. Coyle's

conclusions that Ms. Daniels "has borderline intellectual functioning" and that her "degree of

limitation in daily activities was moderate, in social functioning was mild to moderate, and in

concentration, persistence, and pace was mild."[13] (*Id.* at 13.) The ALJ also analyzed and

---

[13] The plaintiff argues that the ALJ's acceptance of only portions of Dr. Coyle's testimony
represents an unexplained inconsistency in her opinion because the ALJ did not analyze Dr.
Coyle's testimony as to Ms. Daniels's limitations in concentration and pace. (D.E. 24 at 9.) This
assertion is, respectfully, unpersuasive. The ALJ specifically cited to this portion of Dr. Coyle's

recorded the relevant evidence from Dr. Hilger's psychological evaluation concerning Plaintiff's mental ability.[14]

Furthermore, in making her RFC assessment, the ALJ found certain evidence, such as the opinion of Dr. Papaeliou, to be less credible than other evidence. (*Id.* at 16.) Caselaw teaches that "[s]o long as the ALJ 'minimally articulate[s] his reasons for crediting or rejecting evidence of disability,' the determination must stand on review.'" *Amici v. Barnhart*, 2002 U.S. Dist. LEXIS 10216, No. 01 C 50247, *25 (N.D. Ill. May 23, 2002) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)). Minimal articulation "means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning." *Id.* (collecting Seventh Circuit cases). The ALJ's discussion of the record evidence provides an adequate articulation of the reasoning behind her opinion.

The ALJ chose not to accept Dr. Papaeliou's opinion that Daniels should probably be considered totally disabled on a short-term basis. *Id.* She considered evidence from at least seven different doctors, and Dr. Papaeliou was the outlier who stated that Daniels was

---

testimony and noted that she adopted and concurred with Dr. Coyle's findings. (A.R. at 13.) An unexplained inconsistency exists when an ALJ's findings are irreconcilable. *Peterson v. Chater*, 96 F.3d 1015, 1016 (7th Cir. 1996). Thus, in the case cited by the plaintiff, the ALJ found that the claimant was not capable of prolonged sitting, standing or walking, but that he was capable of performing sedentary work, which requires such abilities. *Id.* Conversely, in this case, the ALJ concluded that Plaintiff had borderline intellectual functioning (including all limitations therein), and she noted that Ms. Daniels had a decreased ability to sustain concentration and persistence. (A.R. at 13, 15.) Thus, her adoption of Dr. Coyle's testimony is not an inconsistent finding, but instead supports her RFC assessment.

[14] The ALJ's consideration of Ms. Daniels's intellectual limitations is also discussed further at step five of the analysis.

completely disabled. Similarly, in *Pope v. Shalala*, 998 F.2d 473 (7th Cir. 1993)[15], only one out of five doctors from whom the ALJ considered evidence found that the claimant was completely disabled. *See id.* at 486-87. *Pope* upheld the ALJ's decision to find the doctor's testimony not credible "[b]ecause this was inconsistent with the evidence of every other doctor, and indeed with [the claimant's] own testimony and appearance before the ALJ." *Id.* Likewise, Dr. Papaeliou's opinion that Daniels should be considered totally disabled contradicts the other physicians' medical opinions. Furthermore, as the ALJ notes in her opinion, statements that a claimant is "disabled" are not medical opinions, but "are administrative findings that are dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein. Such issues are reserved to the Commissioner . . . ." (A.R. at 16; SSR 96-5p.) Given these multiple justifications, the ALJ's rejection or minimization of Dr. Papaeliou's testimony seems reasonable. At the least, the Court cannot conclude that the ALJ's credibility finding was "patently wrong in view of the cold record." *Pope*, 998 F.2d at 487.

        iii.       The ALJ's RFC Finding Reflects Proper Consideration of the Claimant's Symptoms and the Objective Medical Evidence

As a result of the aforementioned record findings and her weighing of the medical opinions, the ALJ also found that Ms. Daniels had greater limitations and restrictions than Dr. Smalley assessed. (A.R. at 13.) Dr. Smalley concluded that Daniels had the RFC to lift or carry 10 pounds frequently and 20 pounds occasionally, to stand and/or walk about six hours out of an eight-hour day, and to sit about six hours out of an eight-hour day, but could not climb ladders,

---

[15] *Pope* was overruled on grounds having no relevance to the instant case by *Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999).

ropes, or scaffolds. (*Id.*) He further concluded that Daniels was capable of light work. (*Id.* at 135.) However, in light of the record evidence, the ALJ found that Ms. Daniels was further functionally limited. The ALJ found that Ms. Daniels's RFC limited her to sedentary work, with an additional restriction against climbing ladders, ropes, or scaffolds. (*Id.* at 13.) The ALJ further found Daniels has the ability to perform unskilled, routine, repetitive tasks that do not involve more than one or two-step instructions. (*Id.*) In addition to demonstrating the ALJ's thoroughness, the decision to qualify Smalley's conclusion is proof that she did not "select only that evidence that favors [her] ultimate conclusion." *Stein*, 892 F.2d at 47.

Thus, the ALJ's consideration and discussion of the record evidence reveals substantial evidence in support of her RFC finding. The Plaintiff argues that "while there are certain portions of the evidence that support the ALJ's finding as to Ms. Daniels's physical capabilities," the ruling failed to consider the entire record and is not supported by substantial evidence. (D.E. 24 at 12.) However, in the present case, the ALJ did specifically note that she considered several of the doctors' opinions, the extensive medical record, the Plaintiff's testimony, her father's testimony, and the testimony of the medical expert. Furthermore, she explained why she discounted one of the medical opinions and tempered the conclusion of another.

        b.      The ALJ's Credibility Finding is Proper and Does Not Constitute Legal Error

In making her RFC determination, the ALJ, consistent with SSR 03-2p and the regulations, assessed the credibility of Ms. Daniels's statements about her symptoms and their effects. The ALJ found that Ms. Daniels's statements regarding the constant and extreme pain in her left knee were not fully credible. (A.R. at 16.) Ms. Daniels argues that the ALJ committed

legal error by disregarding factors listed in SSR 96-7p and 20 C.F.R. § 404.1529 that support

Daniels's credibility. The Court respectfully disagrees.

To make her credibility finding, an ALJ should consider all available evidence in relation

to the claimant's statements regarding pain, including: 1) objective medical evidence; 2) the

claimant's medical history; 3) the claimant's statements; 4) medical opinions; 5) the claimant's

daily activities; 6) the location, duration, frequency, and intensity of the claimant's pain; 7)

precipitating and aggravating factors; 8) the type, dosage, effectiveness, and side effects of the

claimant's pain medications; 9) the claimant's other treatment for pain; and 10) other factors

concerning the claimant's pain-related functional limitations and restrictions. 20 C.F.R. §§

404.1528(c)(1)-(4); 416.1529(c)(3); SSR 96-7p, at \*2-3; *Luna v. Shalala*, 22 F.3d 687, 691 (7th

Cir. 1994).

The regulations provide additional guidance for weighing these factors. For example,

objective medical evidence concerning the intensity and persistence of pain, though not required,

is particularly useful and must be considered where available. SSR 96-7p at \*6. In addition, a

statement that is inconsistent with other evidence is generally not credible. *See* 20 C.F.R. §§

404.1529(c)(3), 416.929(c)(3); SSR 96-7p at \*5 (2005). Although an ALJ must consider these

factors and all relevant evidence in making her credibility finding, she does not need to address

every piece of evidence or every aforementioned factor in making that finding. *See Diaz*, 55 F.3d

at 309; *Clay v. Apfel*, 64 F. Supp. 2d 774, 781 (N.D. Ill. 1999). On the contrary, the ALJ's

credibility finding will be upheld as long as it is reasonably articulated, finds some record

support, and is not patently wrong. *Kelley v. Sullivan*, 890 F.2d 961, 964-65 (7th Cir. 1989).

The court affords this special deference to the credibility determinations of hearing officers

23

because they "are in the best position to see and hear the witnesses and assess their forthrightness." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

i.    The ALJ's Credibility Finding is not Patently Wrong

Here, contrary to Plaintiff's allegations, the ALJ did not commit legal error because she considered the entire record and articulated several of the aforementioned factors to support her finding that Ms. Daniels's statements were not fully credible. Specifically, the ALJ considered the objective medical evidence, the claimant's statements as to the intensity of her pain, the claimant's daily activities, and the claimant's pain medication. (A.R. at 15-16.)

The ALJ found that "the objective and clinical signs and findings do not support the claimant's allegations of pain to the degree alleged." (A.R. at 15.) The ALJ considered Daniels's daily activities and her taking of pain medications in light of her allegations of severe pain. (*Id.* at 16.) The ALJ concluded that Ms. Daniels's complaints of constant pain, which the medical record reflects she rated 10/10 on a ten-point scale, were inconsistent with her performance of diverse daily activities, such as cooking, laundry, grocery shopping, sweeping, mopping, mowing the lawn, and shoveling snow. (*Id.*) She also found Plaintiff's complaints of allegedly disabling symptoms non-credible in light of the fact that the record reflects there were extended periods of time when Daniels was not taking any pain medication. (*Id.*)

Ms. Daniels argues the nature of her pain is significant because RSD is characterized as a condition accompanied by chronic pain, frequently out of proportion to the precipitating cause. (D.E. 24 at 15.) The ALJ considered this point, found that the record established the existence of RSD and that treatment was geared towards that diagnosis, but noted that the record lacked evidence of several key symptoms associated with RSD. (*Id.* at 15); *see* SSR 03-2p. Ms. Daniels

24

also contends that the ALJ's consideration of the fact that X-rays and the bone scan were normal is inconsistent with the nature of RSD. (D.E. 15 at 12.) However, although not the only symptoms, bone abnormalities and osteoporosis are diagnostic criteria for RSD. SSR 03-2p. And although the ALJ "may not reject substantive complaints of pain solely because they are not fully supported by medical testimony, the officer may consider that as probative of the claimant's credibility." *Powers*, 207 F.3d at 435 (citing *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995)).

Thus, taken as a whole, the ALJ's articulation of factors from the record to support her credibility finding is reasonable and sufficient. *See Kelley*, 890 F.2d at 964-65. Furthermore, because the ALJ's credibility finding is clearly articulated, is based on several of the appropriate factors, and does not disregard reasonable explanations or an entire line of evidence, it does not constitute legal error. Given the generally heightened level of deference an ALJ enjoys in rendering credibility determinations, and the ALJ's extensive justification in the instant case, the decision to find Daniels's testimony to not be fully credible was permissible.

> ii.  The ALJ Did Not "Play Doctor" in Making Her Credibility Finding

An ALJ cannot "play doctor" by substituting her opinions for those of a physician or by making judgments that are unsupported by objective medical evidence. *Rohan v. Chater*, 98 F.3d 966, 970-71 (7th Cir. 1996). Typically, however, reversal is not appropriate unless the ALJ also failed to address relevant evidence, *Dixon*, 270 F.3d at 1177-78, or if she made a medical conclusion without relying on any objective medical evidence. *See Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000). In fact, where an ALJ articulates supporting medical evidence in her alleged "medical opinions," she does not play doctor. *Dixon*, 270 F.3d at 1178.

25

Daniels argues the ALJ was "playing doctor" when she "appear[ed] to question the legitimacy of RSD" and "apparently us[ed] this questioning as grounds for discounting Ms. Daniels's credibility." (D.E. 15 at 13.) However, it is not correct to say that the ALJ rejected the RSD diagnosis; to the contrary, the ALJ found "that the claimant has the following medically determinable impairments: left knee paid/reflect sympathetic dystrophy." (A.R. 12.) This conclusion is also reflected in the findings of the ALJ's opinion. (*Id.* at 17.) Elsewhere in the body of the opinion, the ALJ again acknowledged the existence of RSD, and noted that she believed Daniels experienced some degree of pain in her left leg. (A.R. at 15.) However, the ALJ recognized that the record lacked evidence of specific symptoms of RSD. (*Id.*) The ALJ also acknowledged that in making her decision concerning whether a disability finding is appropriate, the ALJ "must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 CFR §§ 404.1529 and 416.929, and Social Security Ruling 96-7p." (A.R. 13.) The ALJ added that, "I must also consider any medical opinions, which are statements from acceptable medical sources, which reflect judgments about the nature and severity of the impairments and resulting limitations (20 CFR §§ 404.1527 and 416.927 and Social Security Rulings 96-2p and 96-6p)." (*Id.*)

In this regard, the ALJ noted that the record contains "no evidence of warm, shiny red skin, no evidence of disuse of the left lower extremity (muscle strength in the lower extremities), and no evidence of bone atrophy." (*Id.*) Thus, rather than playing doctor, the ALJ accurately articulated a lack of supporting medical evidence from Daniels's medical record that served to contribute to the conclusion that Plaintiff's testimony was not fully credible. (*See* A.R. 15, 16.)

26

She did not fail to address or rely on medical evidence; to the contrary, the ALJ addressed all relevant evidence—including, where appropriate, the lack thereof. *See Dixon*, 270 F.3d at 1178. The ALJ was quite thorough in this regard, and while she did not fully credit every assertion Plaintiff made, Plaintiff offers no authority to suggest a rule of law that requires an ALJ to credit fully every self-serving assertion of chronic pain when there is substantial medical evidence that suggests and certainly permits a contrary conclusion. Or, as then-Judge Flaum instructed in *Cass v. Shalala*, 8 F.3d 552, 555-56 (7th Cir. 1993), "[w]hile the law requires an ALJ to weigh all the credible evidence and make unbiased factual findings, it does not compel an ALJ to accept wholly the claimant's perception of a disability. From our review of the record, such a credibility determination is exactly what happened in Plaintiff's case."). In conclusion, the ALJ did not "play doctor," but rather functioned as a careful factfinder, and her credibility determination is affirmed.

B.     The ALJ's Findings as to Daniels's Capacity to Work in the National Economy Are Supported by Substantial Evidence

Once the ALJ determines at step four that a claimant cannot perform her past relevant work, the ALJ moves to the fifth and final consideration of whether the claimant is capable of performing other work in the national economy. 20 C.F.R. § 404.1520. In making this final determination, the burden, as the ALJ in this case noted, is "on the Administration to prove that there are other jobs existing in significant numbers in the national economy which the claimant can perform consistent with her medically determinable impairments and symptoms, functional limitations, age, education, work experience, and skills." (A.R. at 16-17); *see Herron v. Shalala*, 19 F.3d 329, 333 n.8 (7th Cir. 1994). The ALJ can satisfy this burden using 20 C.F.R. §

404.1569, the medical vocational grid rules, and/or vocational expert testimony. *See DeFrancesco v. Bowen*, 867 F.2d 1040, 1045 (7th Cir. 1989); *Binzen v. Barnhart*, No. 01 C 2715, 2002 WL 31324061, at *5 (N.D. Ill. Oct. 16, 2002); *McCloskey v. Apfel*, No. 97 C 6937, 1998 WL 473056, at *5 (N.D. Ill. Aug. 6, 1998); *see also* A.R. at 17. In the instant case, the ALJ chose to obtain vocational expert input. (*Id.*)

      1.    The ALJ Properly Accepted the Vocational Expert's Testimony

Courts have held that a vocational expert's answer to a hypothetical question including a claimant's RFC, as well as consideration of a person's age, education and past experience can provide substantial evidence that there are jobs in the national economy that the claimant is capable of performing. *See Cass*, 8 F.3d at 555-56. To be utilized, the Seventh Circuit teaches that "[h]ypothetical questions posed to vocational experts ordinarily must include all limitations supported by medical evidence in the record." *Steele*, 290 F.3d at 942. This prevents the vocational expert from referring "to jobs that the applicant cannot work because the expert did not know the full range of the applicant's limitations." *Id.* However, the hypothetical question "need not take into consideration every detail of the claimant's impairments especially if the record demonstrates that the vocational expert reviewed all the evidence prior to the hearing." *Herron*, 19 F.3d at 337 (collecting cases).

At the hearing, the ALJ posed a hypothetical question to the vocational expert, describing someone of Ms. Daniels's age, education, work experience, who was limited to sedentary work and could not climb ropes, ladders or scaffolds, and who would be limited to unskilled, routine, and repetitive tasks, involving one- to two-step instructions. (A.R. at 333.) The vocational expert went on to explain that these jobs included substantial regularly scheduled breaks, as well

as roughly six to eight unscheduled breaks of two or three minutes each daily. (*Id.* at 334-35.)

The ALJ properly accepted the vocational expert's testimony in response to this question that there were jobs available in the economy that would accommodate someone with these characteristics. (*Id.* at 17.) In her decision, the ALJ cited to the vocational expert's testimony that these jobs included hand packager, small parts mechanical assembler, and electronic assembler and that these jobs numbered around 10,000 in the regional economy. (*Id.*) She also referenced the vocational expert's testimony that these jobs would not require the operation of arm or leg controls. (*Id.*) Furthermore, the ALJ noted that the jobs identified do not require performance of any of the activities restricted by Dr. Murphy. (*Id.* at 16.) Thus, the ALJ's use of the vocational expert's testimony was a proper articulation of the basis for her decision. *See Herron*, 19 F.3d at 337 (collecting cases).

2.    The ALJ Considered Ms. Daniels's Intellectual Limitations

Plaintiff argues she cannot perform the jobs identified by the vocational expert due to her mental limitations which affect her ability to concentrate and keep pace. (D.E. 24 at 8.) Specifically, she argues the ALJ failed to consider the impact of the testimony of Drs. Coyle and Hilger, both of whom concluded that she would have some difficulty with sustaining concentration and keeping pace. (*Id.*) Dr. Coyle characterized the limitation as "mild" (A.R. 328)—as compared to, for example, "moderate," "marked," or "extreme"[16]—and Dr. Hilger characterized Ms. Daniels as having "below average" ability in this regard (A.R. 137). At the hearing, Dr. Coyle testified that Ms. Daniels's mental ability was below average and that she

---

[16] *See* A.R. 149 (evaluation of Dr. Tomassetti, similarly rejecting more acute limitations quoted above and characterizing limitation as "mild").

would have difficulty understanding detailed instructions and performing detailed, multi-step tasks. (A.R. at 326-27.) He also testified that Ms. Daniels would have mild limitations in concentration, persistence, and pace. (*Id.* at 328.) The ALJ specifically concurred with and adopted these findings as to Ms. Daniels's mental impairment. (*Id.* at 13.)[17] Thus, in finding that Daniels's RFC limits her to jobs that would require her to "perform unskilled, routine, repetitive tasks that do not involve more than one or two-step instructions," the ALJ considered the testimony of Dr. Coyle and the "mild" limitation issue. (*Id.*)

3. The Record Does Not Establish that Ms. Daniels's Mental Limitations Prevent Her From Performing Work in the National Economy

Relatedly, Plaintiff also argues that "the ability to do unskilled tasks or follow very simple instruction is different than the ability to concentrate or keep up a production pace" and thus prevents her from performing the jobs identified by the vocational expert. (D.E. 24 at 9.) However, even though the burden is on the Commissioner at this point in the evaluation process,

---

[17] Plaintiff suggests in her brief that the ALJ could not have relied on the testimony of the DDS psychologist because the ALJ "included borderline intellectual functioning as one of Ms. Daniels's impairments and limited Ms. Daniels to routine tasks, despite the view of the DDS psychologist that she did not have a severe psychological impairment." (D.E. 24 at 6.) Although this argument is, with all respect, difficult to follow, it is unpersuasive, at least as presented. Many people are less able intellectually than others; perhaps they are even so limited in terms of intellectual aptitude that they fairly can be characterized, in that aspect of their lives at least, as having "borderline" abilities. But there is no commonsense reason to conclude that those individuals suffer from a "severe psychological impairment," as Plaintiff's argument would suggest, and Plaintiff offers no legal authority or citation to medical literature that would require or suggest such a conclusion. Moreover, even if Plaintiff's choice of the term "severe psychological impairment" is simply an inartfully drawn phrase, or the employment of some legal term generically employed in the Social Security benefits setting (Plaintiff does not suggest that it is, but the Court will give Plaintiff the benefit of the doubt and at least assume that is possible), Plaintiff's argument still is not persuasive. The DDS psychologist himself found that Ms. Daniels had borderline intellectual functioning, as did the ALJ, so the purported rejection of the testimony is not there. Plaintiff's argument, at least as presented, is respectfully rejected.

the ALJ's decision meets the substantial evidence standard. Under this standard, she need not discuss every piece of evidence in the record, though she must consider all relevant evidence and cannot disregard an entire line of evidence contrary to her findings. *See Diaz*, 55 F.3d at 307-08. The ALJ did not disregard an entire line of evidence as to Daniels's limitations in concentration and ability to keep pace.

First, when the vocational expert made his determination as to available jobs Daniels could perform, he was aware of the evidence concerning Daniels's mild limitations with concentration and pace. (A.R. at 334.[18]) In *Herron*, the court noted that "because the VE reviewed the medical reports before giving his assessment . . . 'the VE's testimony constitute[d] substantial evidence . . . despite any omissions in the hypothetical.'" *Id.*, 19 F.3d at 337 (quoting *Cass*, 8 F.3d at 556). In the present case, the vocational expert testified that he was present for Dr. Coyle's testimony at the hearing and that he was familiar with the record. (A.R. at 331.) Thus, the vocational expert was familiar with Ms. Daniels's mental limitations, specifically with regards to concentration and pace.

The vocational expert then testified that all the jobs he identified required "some kind of ongoing pace." (*Id.* at 334). He testified that someone who performed the jobs he suggested Daniels was capable of would generally have a ten to fifteen minute break after two hours, a half an hour lunch after another two hours, and then another ten to fifteen minute break after another two hours. (*Id.*) In addition to these scheduled breaks, the jobs he referenced would usually have

---

[18]  The vocational expert also was aware of the potential for limitations that might be presented by virtue of Ms. Daniels's knee problems, as the vocational expert had reviewed the record before the hearing and also was present for testimony of Dr. Coyle, who referenced the issue. *See* A.R. 327, 331; *accord Herron*, 19 F.3d at 337 (collecting cases).

an additional five percent downtime each day. (*Id.*) Plaintiff attempts to seize upon the vocational expert's acknowledgment that these jobs naturally required "some kind of ongoing pace," but the acknowledgment of that obvious fact does not fairly support the weight that Plaintiff would ascribe to it. All jobs require the maintenance of "some kind" of pace, and there was no suggestion in the testimony that the pace associated with such jobs was relentless or even fast; here, the ALJ reasonably accommodated the "mild" limitations that Plaintiff had with concentration and pace by restricting the job analysis to unskilled, routine, repetitive tasks that did not involve more than one- or two-step instructions and in which substantial regular and modest additional unscheduled breaks are available. Under applicable precedent, such an approach was permissible. *See, e.g., Herron,* 19 F.3d at 337 (hypothetical question concerning job availability "need not take into consideration every detail of the claimant's impairments especially if the record demonstrates that the vocational expert reviewed all the evidence prior to the hearing"); *accord Diaz,* 55 F.3d at 307-08.

In sum, the ALJ provided substantial evidence to support her opinion that work exists in significant numbers in the national economy that Ms. Daniels is capable of performing. Ms. Daniels's challenge in this regard is respectfully rejected.

## IV.  **CONCLUSION**

The Court is not unsympathetic to the challenges that Ms. Daniels likely faces in life. One cannot read the administrative record without coming to the conclusion (as did the ALJ) that Ms. Daniels has some degree of pain in her knee, and Ms. Daniels surely faces certain challenges because her raw intellectual abilities do not appear to be among her greatest strengths as a person.  At the same time, the ALJ's conclusion that Ms. Daniels did not qualify for disability benefits—because her situation is insufficiently severe under the applicable Social Security regimes to constitute a disability status, at least at this time—was reached after a thorough analysis of the record.  The ALJ's conclusion appears to be reasonable and it is not infected with reversible error, particularly given the deferential standard applicable to review of at least certain key aspects of an SSA disability determination.  Accordingly, the summary judgment motion of the Social Security Administration (D.E. 19) is granted, and Plaintiff's motion (D.E. 14) is respectfully denied.

Mark Filip
United States District Judge
Northern District of Illinois

Dated: 7/20/05

33